# EXHIBIT A

MIN: 1  01                                                    Loan Number: _____

## ADJUSTABLE RATE NOTE

### (MTA-Twelve Month Average Index - Payment Caps)

T  S NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
A  ) THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
T  AT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE
P  NCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
O  IGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT
STATED IN THIS NOTE.

OCTOBER 20, 2006                    BOCA RATON              FLORIDA
     [Date]                            [City]                [State]

       1500 BAY ROAD, UNIT 746, MIAMI BEACH, FLORIDA 33139
                            [Property Address]

**1.   BORROWER'S PROMISE TO PAY**
       In return for a loan that I have received, I promise to pay U.S. $742,890.00  (this amount is
called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under
the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT            ) of the
Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is LIBERTY MORTGAGE
OF SOUTH FLORIDA IX, LLC, A FLORIDA LIMITED LIABILITY COMPANY                          .
I will make all payments under this Note in the form of cash, check or money order.
       I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
       **(A)   Interest Rate**
       Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay
interest at a yearly rate of  2.500  %.  The interest rate I will pay may change.
       The interest rate required by this Section 2 is the rate I will pay both before and after any default described
in Section 7(B) of this Note.

       **(B)   Interest Rate Change Dates**
       The interest rate I will pay may change on the      1st     day of  DECEMBER, 2006     ,
and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest
Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The
interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

       **(C)   Index**
       Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index.
The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury
Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal
Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month
Average is determined by adding together the Monthly Yields for the most recently available twelve months and
dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change
Date is called the "Current Index".
       If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.

       **(D)   Calculation of Interest Rate Changes**
       Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 050/1000      percentage point(s)  3.050  % ("Margin") to the Current Index. The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My
interest will never be greater than  9.950  %. Beginning with the first Interest Rate Change Date, my interest
rate will never be lower than the Margin.

**3.   PAYMENTS**
       **(A)   Time and Place of Payments**
       I will make a payment every month.
       I will make my monthly payments on the      1st         day of each month beginning on
DECEMBER 1, 2006  . I will make these payments every month until I have paid all the Principal and
Interest and any other charges described below that I may owe under this Note. Each monthly payment will be
applied as of its scheduled due date and will be applied to interest before Principal. If, on
NOVEMBER 1, 2046 , I still owe amounts under this Note, I will pay those amounts in full on that date,
which is called the "Maturity Date."
       I will make my monthly payments at 568 YAMATO ROAD SECOND FLOOR, BOCA
RATON, FLORIDA 33431
or at a different place if required by the Note Holder.

**PayOption ARM Note - MTA Index**
FE-5312(FL) (0511)                              Page 1 of 6



**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $1,460.26        unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the  1st
                           day of  DECEMBER, 2007  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to  115.000  percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the     5th      Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
   (i)     **Interest Only Payment:**  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
   (ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
   (iii)   **15 Year Amortized Payment:**  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

**PayOption ARM Note - MTA Index**
**FE-5312(FL)** (0511)               Page 2 of 4                    

**4.   NOTICE OF CHANGES**

   The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY          ** See attached Prepayment Note Addendum.**

   I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

   I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me.  If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A)   Late Charges for Overdue Payments**

   If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

   **(B)   Default**

   If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C)   Notice of Default**

   If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   **(D)   No Waiver By Note Holder**

   Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E)   Payment of Note Holder's Costs and Expenses**

   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

   Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

   Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

   If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.



**10.  WAIVERS**
     I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  SECURED NOTE**
     In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

          **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

          If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

          To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

          If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.  DOCUMENTARY TAX**
     The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_____ (Seal)
RYAN ATKIN                                        -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE, FLORIDA,

Case No:
Plaintiff THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA4 PASS-THROUGH CERTIFICATES, SERIES 2007-OA4
Defendant: RYAN ATKIN; *et al*

Filed by the: PLAINTIFF

IDENTIFICATION as exhibit # __________

ADMITTED INTO EVIDENCE as exhibit # 1
__________ with objection __________ without objection

This date: NOVEMBER 7TH, 2013
By: ______________________
PRESIDING JUDGE

## ALLONGE

LOAN #: ████

Borrower(s):  RYAN ATKIN

Property Address:  1500 BAY ROAD, UNIT 746, MIAMI BEACH, FLORIDA 33139

Principal Balance:  $442,800.00

Loan Date:  OCTOBER 20, 2006

### PAY TO THE ORDER OF

Countrywide Bank, N.A.

**Without Recourse**

Company  Name:  LIBERTY MORTGAGE OF SOUTH FLORIDA IX, LLC

By: _____          RICHARD PHILLIPS, PRESIDENT
                (Name)                                      (Title)

Pay to the order of.                    Pay to the order of:

Countrywide Home Loans, Inc.        _____

Without Recourse                        Without Recourse
Countrywide Bank, N.A.              Countrywide Home Loans, Inc.

By: _Laurie Meder_                  By: _Michele Sjolander_
      Laurie Meder, SVP                  Michele Sjolander, SVP

Multistate  Note  Allonge

A.bt

# EXHIBIT B

```
CFN  2006R1235677
OR Bk 25111 Pgs 1267 - 1290; (24pgs)
RECORDED 11/18/2006 14:15:01
MTG DOC TAX 1,549.80
INTANG TAX 885.60
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
```

This Instrument Prepared By:

Donna Palermo

After Recording Return To:
LIBERTY HOME LENDING, INC.
568 YAMATO ROAD SECOND FLOOR
BOCA RATON, FLORIDA 33431
Loan Number: 1001488

Record & Return to:
Felberbaum & Associate
Resource Title Co, Inc.
399 S Federal Hwy
Boca Raton, FL 33432

———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE

**MIN:** ▓▓▓▓▓▓▓▓▓▓

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated   OCTOBER 20, 2006           , together with all Riders to this document.
**(B)** "**Borrower**" is  RYAN ATKIN, A SINGLE PERSON AND NOY HADAR, A SINGLE PERSON

Borrower is the mortgagor under this Security Instrument.
**(C)** "**MERS**" is  Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the mortgagee under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.
**(D)** "**Lender**" is  LIBERTY MORTGAGE OF SOUTH FLORIDA IX, LLC

Lender is a  FLORIDA LIMITED LIABILITY COMPANY                        organized and existing under the laws of  FLORIDA                                   .
Lender's address is  568 YAMATO ROAD SECOND FLOOR, BOCA RATON, FLORIDA 33431

**(E)** "**Note**" means the promissory note signed by Borrower and dated   OCTOBER 20, 2006                .
The Note states that Borrower owes Lender   FOUR HUNDRED FORTY-TWO THOUSAND EIGHT HUNDRED AND 00/100            Dollars (U.S. $ 442,800.00      ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2046         .
**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

Borrower Initials:  *NH*    *RA*    _____    _____    _____    _____

DocMagic *eForms* 800-649-1362
www.docmagic.com

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| ☒ | Adjustable Rate Rider | ☐ | Planned Unit Development Rider |
| ☐ | Balloon Rider | ☐ | Biweekly Payment Rider |
| ☐ | 1-4 Family Rider | ☐ | Second Home Rider |
| ☒ | Condominium Rider | ☐ | Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Borrower Initials: _N.H._  _R.A._  ____ ____ ____ ____

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                    Page 2 of 15                            DocMagic eForms 800-649-1362
www.docmagic.com

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

| COUNTY | of | MIAMI–DADE | : |

[Type of Recording Jurisdiction]                                    [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

which currently has the address of           1500 BAY ROAD, UNIT 746

[Street]

MIAMI BEACH                         , Florida        33139        ("Property Address"):

[City]                                                   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower Initials: _NH_    _RA_   _____   _____   _____   _____

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                Page 3 of 15          DocMagic eForms 800-649-1362
www.docmagic.com

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

Borrower Initials: _NH_  _RA_ _____ _____ _____ _____

assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder

Borrower Initials:  _N H_      _R A_      _____      _____      _____      _____

of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.

Borrower Initials: _N.H._   _R.A._   _____   _____   _____   _____

If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

   8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

   9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Borrower Initials: _NH_ _RA_ _____ _____ _____ _____

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease.  Borrower shall not, without the express written consent of Lender, alter or amend the ground lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses.  If such agreement provides that an affiliate of Lender takes a share

Borrower  Initials:   _N H_     _R A_     _____   _____   _____   _____

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                    Page 8 of 15                          DocMagic *eForms* 800-649-1362
www.docmagic.com

of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."  Further:

(a)  Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan.  Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)  Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law.  These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower Initials:  _NH_    _RA_    _____    _____    _____    _____

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                                   Page 9 of 15                    DocMagic eForms 800-649-1362
www.docmagic.com

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

Borrower Initials: _MH_   _R.A._   _____   _____   _____   _____

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

Borrower Initials: _NH_   _R.A._   _____   _____   _____   _____

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

Borrower Initials: _NH_   _R.A._   _____   _____   _____   _____

to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

Borrower Initials: _NH_  _RA_  _____  _____  _____  _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
RYAN ATKIN                    -Borrower
1500 BAY ROAD, UNIT 746,
MIAMI BEACH, FLORIDA 33139

_____ (Seal)
NOY HADAR                     -Borrower
1500 BAY ROAD, UNIT 746, MIAMI
BEACH, FLORIDA 33139

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

Signed, sealed and delivered in the presence of:

_____
Witness  Will Edwards

_____
Witness  Rolando Silva

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                  Page 14 of 15

DocMagic *eForms* 800-649-1362
www.docmagic.com

STATE OF FLORIDA
COUNTY OF Miami~Dade

The foregoing instrument was acknowledged before me this 20ᵗʰ day of October 2006
by   RYAN ATKIN, NOY HADAR

who is personally known to me or who has produced FL DL
as identification.                                      (Type of Identification)

NOTARY PUBLIC
STATE OF FLORIDA
WILLIAM EDWARDS
MY COMMISSION # DD600550
EXPIRES: Oct. 1, 2010
(407) 398-0153   Florida Notary Service.com

_____
Signature

William Edwards
_____
Name of Notary

Notary Public.
_____
Title

(Seal)

_____
Serial Number, if any

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT – MERS
Form 3010 1/01                          Page 15 of 15                          DocMagic eForms 800-649-1362
www.docmagic.com

Loan Number: ██████████

Date: OCTOBER 20, 2006

Property Address: 1500 BAY ROAD, UNIT 746, MIAMI BEACH, FLORIDA 33139

## EXHIBIT "A"

## LEGAL DESCRIPTION

## Loan Number: ████████

Unit No. **746S** in FLAMINGO/SOUTH BEACH I CONDOMINIUM, according to the Declaration of Condominium thereof, recorded September 15, 2006, in Official Records Book 24914, at Page 3803, Public Records of Miami-Dade County, Florida, as amended and/or supplemented from time to time.

A.P.N. # : _____

DocMagic *eForms* 800-649-1362
www.docmagic.com

MIN: ███████████████        Loan Number: ███████
Doc ID#:

# ADJUSTABLE RATE RIDER
## (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this          20th          day of OCTOBER
2006                , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
LIBERTY MORTGAGE OF SOUTH FLORIDA IX, LLC, A FLORIDA LIMITED LIABILITY COMPANY
("Lender") of the same date and covering the property described in the Security Instrument and
located at:
        1500 BAY ROAD, UNIT 746, MIAMI BEACH, FLORIDA 33139
                              [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2.   INTEREST**
**(A)   Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of    2.500 %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

**(B)   Interest Rate Change Dates**
The interest rate I will pay may change on the     1st        day of DECEMBER
2006             , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

Borrower Initials: *NH*    *RA*    _____  _____  _____  _____

**PayOption MTA ARM Rider**
**FE-5315 (0511)**                          Page 1 of 5

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 050/1000    percentage point(s)   3.050 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.  PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the·   1st         day of each month beginning on DECEMBER 1, 2006 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 1, 2046   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 568 YAMATO ROAD SECOND FLOOR, BOCA RATON, FLORIDA 33431
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,460.26         unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the   1st day of DECEMBER, 2007   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" ·is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

Borrower Initials: _N.H_____   _R.A._____   _____   _____   _____   _____
**PayOption MTA ARM Rider**
**FE-5315 (0511)**                          Page 2 of 5

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075.  The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to  my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000 percent ( 115.000 %)of  the  Principal  amount  I  originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On  the    5th        Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**PayOption MTA ARM Rider**
**FE-5315 (0511)**                                                        Page 3 of 5
Borrower Initials: _NH_    _R.A._    _____    _____    _____

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

> (i)    **Interest Only Payment:**  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
> (ii)   **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
> (iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Borrower Initials: _NH_     _R.A_     _____   _____   _____   _____
PayOption MTA ARM Rider
FE-5315 (0511)                                  Page 4 of 5

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_RYAN ATKIN_                                     -Borrower

_NOY HADAR_                                       -Borrower

                                              -Borrower

                                              -Borrower

PayOption MTA ARM Rider
**FE-5315 (0511)**                           **Page 5 of 5**

Loan Number: ████████

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 20th day of OCTOBER, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to LIBERTY MORTGAGE OF SOUTH FLORIDA IX, LLC, A FLORIDA LIMITED LIABILITY COMPANY (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

1500 BAY ROAD, UNIT 746, MIAMI BEACH, FLORIDA 33139
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

FLAMINGO SOUTH BEACH
[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower Initials: _MH_ _R.A._ _____ _____ _____ _____

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.  Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.  Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.  Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.  Remedies.**  If Borrower does not pay condominium dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Borrower Initials: _NH_  _RA_  _____  _____  _____  _____

OR BK 25411 PG 1290
LAST PAGE

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)
RYAN ATKIN                    -Borrower

_____ (Seal)
NOY HADAR                     -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

# EXHIBIT C

Shellpoint Mortgage Servicing
P.O. Box 9103
Temecula, CA  92589-9103



2383963839

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

Send Payments to:
Shellpoint Mortgage Servicing
P.O. Box 650840
Dallas, TX  75265-0840

Send Correspondence to:
Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC  29603

20231010-354

Ryan Atkin
1500 BAY RD APT 848
MIAMI BEACH, FL 33139-3224





P.O. Box 10826
Greenville, SC 29603
**Phone:** 866-825-2174
**Fax:** 866-467-1187
www.shellpointmtg.com

Sent Via First-Class Mail®

10/10/2023

Ryan Atkin
1500 BAY RD APT 848
MIAMI BEACH, FL 33139-3224

Loan Number: ███████
Property Address:   1500 Bay Road #746
                    Miami Beach, FL 33139

Dear Ryan Atkin:

This letter is formal notice by Shellpoint Mortgage Servicing, the Servicer of the above-referenced loan, on behalf of THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA4, that you are in default under the terms of the documents creating and securing your Loan described above, including the Note and Deed of Trust/Mortgage/Security Deed ("Security Instrument"), for failure to pay amounts due.

You have a right to cure your default.  To cure the default, you must pay the full amount of the default on this loan by 11/14/2023 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter).  Failure to cure the default on or before this date may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding and sale of the property.

As of the date of this notice, the total amount required to cure the default is $489,406.90, which consists of the following:

| | | |
|---|---|---|
| Next Payment Due Date: | | 10/01/2008 |
| Total Monthly Payments Due: | | $480,275.59 |
| 10/01/2008 | at | $2,342.91 |
| 11/01/2008 | at | $2,342.91 |
| 12/01/2008 | at | $2,460.64 |
| 01/01/2009 | at | $2,460.64 |
| 02/01/2009 | at | $2,460.64 |
| 03/01/2009 | at | $2,460.64 |
| 04/01/2009 | at | $2,460.64 |
| 05/01/2009 | at | $2,460.64 |
| 06/01/2009 | at | $2,460.64 |
| 07/01/2009 | at | $2,460.64 |
| 08/01/2009 | at | $2,460.64 |
| 09/01/2009 | at | $2,460.64 |
| 10/01/2009 | at | $2,460.64 |
| 11/01/2009 | at | $2,460.64 |
| 12/01/2009 | at | $2,587.20 |
| 01/01/2010 | at | $2,587.20 |
| 02/01/2010 | at | $2,587.20 |



W_FL_DEMAND      Rev. 12/2022
Page 1 of 6

2383963839

| | | |
|---|---|---|
| 03/01/2010 | at | $2,587.20 |
| 04/01/2010 | at | $2,587.20 |
| 05/01/2010 | at | $2,587.20 |
| 06/01/2010 | at | $2,587.20 |
| 07/01/2010 | at | $2,587.20 |
| 08/01/2010 | at | $2,587.20 |
| 09/01/2010 | at | $2,587.20 |
| 10/01/2010 | at | $2,587.20 |
| 11/01/2010 | at | $2,587.20 |
| 12/01/2010 | at | $2,649.49 |
| 01/01/2011 | at | $2,649.49 |
| 02/01/2011 | at | $2,649.49 |
| 03/01/2011 | at | $2,649.49 |
| 04/01/2011 | at | $2,649.49 |
| 05/01/2011 | at | $2,649.49 |
| 06/01/2011 | at | $2,649.49 |
| 07/01/2011 | at | $2,649.49 |
| 08/01/2011 | at | $2,649.49 |
| 09/01/2011 | at | $2,649.49 |
| 10/01/2011 | at | $2,649.49 |
| 11/01/2011 | at | $2,649.49 |
| 12/01/2011 | at | $2,615.90 |
| 01/01/2012 | at | $2,615.90 |
| 02/01/2012 | at | $2,615.90 |
| 03/01/2012 | at | $2,615.90 |
| 04/01/2012 | at | $2,615.90 |
| 05/01/2012 | at | $2,615.90 |
| 06/01/2012 | at | $2,615.90 |
| 07/01/2012 | at | $2,615.90 |
| 08/01/2012 | at | $2,615.90 |
| 09/01/2012 | at | $2,615.90 |
| 10/01/2012 | at | $2,615.90 |
| 11/01/2012 | at | $2,615.90 |
| 12/01/2012 | at | $2,615.90 |
| 01/01/2013 | at | $2,615.90 |
| 02/01/2013 | at | $2,615.90 |
| 03/01/2013 | at | $2,615.90 |
| 04/01/2013 | at | $2,615.90 |
| 05/01/2013 | at | $2,615.90 |
| 06/01/2013 | at | $2,615.90 |
| 07/01/2013 | at | $2,615.90 |
| 08/01/2013 | at | $2,615.90 |
| 09/01/2013 | at | $2,615.90 |
| 10/01/2013 | at | $2,615.90 |
| 11/01/2013 | at | $2,615.90 |
| 12/01/2013 | at | $2,615.90 |
| 01/01/2014 | at | $2,615.90 |
| 02/01/2014 | at | $2,615.90 |
| 03/01/2014 | at | $2,615.90 |
| 04/01/2014 | at | $2,615.90 |
| 05/01/2014 | at | $2,615.90 |
| 06/01/2014 | at | $2,615.90 |
| 07/01/2014 | at | $2,615.90 |

| 08/01/2014 | at | $2,615.90 |
| 09/01/2014 | at | $2,615.90 |
| 10/01/2014 | at | $2,615.90 |
| 11/01/2014 | at | $2,615.90 |
| 12/01/2014 | at | $2,583.51 |
| 01/01/2015 | at | $2,583.51 |
| 02/01/2015 | at | $2,583.51 |
| 03/01/2015 | at | $2,583.51 |
| 04/01/2015 | at | $2,583.51 |
| 05/01/2015 | at | $2,583.51 |
| 06/01/2015 | at | $2,583.51 |
| 07/01/2015 | at | $2,583.51 |
| 08/01/2015 | at | $2,583.51 |
| 09/01/2015 | at | $2,583.51 |
| 10/01/2015 | at | $2,583.51 |
| 11/01/2015 | at | $2,583.51 |
| 12/01/2015 | at | $2,614.33 |
| 01/01/2016 | at | $2,614.33 |
| 02/01/2016 | at | $2,614.33 |
| 03/01/2016 | at | $2,614.33 |
| 04/01/2016 | at | $2,614.33 |
| 05/01/2016 | at | $2,614.33 |
| 06/01/2016 | at | $2,614.33 |
| 07/01/2016 | at | $2,614.33 |
| 08/01/2016 | at | $2,614.33 |
| 09/01/2016 | at | $2,614.33 |
| 10/01/2016 | at | $2,614.33 |
| 11/01/2016 | at | $2,614.33 |
| 12/01/2016 | at | $2,705.99 |
| 01/01/2017 | at | $2,705.99 |
| 02/01/2017 | at | $2,705.99 |
| 03/01/2017 | at | $2,705.99 |
| 04/01/2017 | at | $2,705.99 |
| 05/01/2017 | at | $2,705.99 |
| 06/01/2017 | at | $2,705.99 |
| 07/01/2017 | at | $2,705.99 |
| 08/01/2017 | at | $2,705.99 |
| 09/01/2017 | at | $2,705.99 |
| 10/01/2017 | at | $2,705.99 |
| 11/01/2017 | at | $2,705.99 |
| 12/01/2017 | at | $2,797.11 |
| 01/01/2018 | at | $2,797.11 |
| 02/01/2018 | at | $2,797.11 |
| 03/01/2018 | at | $2,797.11 |
| 04/01/2018 | at | $2,797.11 |
| 05/01/2018 | at | $2,797.11 |
| 06/01/2018 | at | $2,797.11 |
| 07/01/2018 | at | $2,797.11 |
| 08/01/2018 | at | $2,797.11 |
| 09/01/2018 | at | $2,797.11 |
| 10/01/2018 | at | $2,797.11 |
| 11/01/2018 | at | $2,797.11 |
| 12/01/2018 | at | $2,948.91 |



| | | |
|---|---|---|
| 01/01/2019 | at | $2,948.91 |
| 02/01/2019 | at | $2,948.91 |
| 03/01/2019 | at | $3,091.78 |
| 04/01/2019 | at | $3,091.78 |
| 05/01/2019 | at | $3,091.78 |
| 06/01/2019 | at | $3,091.78 |
| 07/01/2019 | at | $3,091.78 |
| 08/01/2019 | at | $3,091.78 |
| 09/01/2019 | at | $3,091.78 |
| 10/01/2019 | at | $3,091.78 |
| 11/01/2019 | at | $3,091.78 |
| 12/01/2019 | at | $3,254.96 |
| 01/01/2020 | at | $3,254.96 |
| 02/01/2020 | at | $3,254.96 |
| 03/01/2020 | at | $2,964.16 |
| 04/01/2020 | at | $2,964.16 |
| 05/01/2020 | at | $2,964.16 |
| 06/01/2020 | at | $2,964.16 |
| 07/01/2020 | at | $2,964.16 |
| 08/01/2020 | at | $2,964.16 |
| 09/01/2020 | at | $2,964.16 |
| 10/01/2020 | at | $2,964.16 |
| 11/01/2020 | at | $2,964.16 |
| 12/01/2020 | at | $2,622.80 |
| 01/01/2021 | at | $2,622.80 |
| 02/01/2021 | at | $2,622.80 |
| 03/01/2021 | at | $2,622.80 |
| 04/01/2021 | at | $2,537.44 |
| 05/01/2021 | at | $2,537.44 |
| 06/01/2021 | at | $2,537.44 |
| 07/01/2021 | at | $2,537.44 |
| 08/01/2021 | at | $2,537.44 |
| 09/01/2021 | at | $2,537.44 |
| 10/01/2021 | at | $2,537.44 |
| 11/01/2021 | at | $2,537.44 |
| 12/01/2021 | at | $2,398.95 |
| 01/01/2022 | at | $2,398.95 |
| 02/01/2022 | at | $2,398.95 |
| 03/01/2022 | at | $2,392.52 |
| 04/01/2022 | at | $2,392.52 |
| 05/01/2022 | at | $2,392.52 |
| 06/01/2022 | at | $2,392.52 |
| 07/01/2022 | at | $2,392.52 |
| 08/01/2022 | at | $2,392.52 |
| 09/01/2022 | at | $2,392.52 |
| 10/01/2022 | at | $2,392.52 |
| 11/01/2022 | at | $2,392.52 |
| 12/01/2022 | at | $2,531.95 |
| 01/01/2023 | at | $2,531.95 |
| 02/01/2023 | at | $2,531.95 |
| 03/01/2023 | at | $2,550.87 |
| 04/01/2023 | at | $2,550.87 |
| 05/01/2023 | at | $2,550.87 |

| 06/01/2023 | at | $2,550.87 |
| 07/01/2023 | at | $2,550.87 |
| 08/01/2023 | at | $2,550.87 |
| 09/01/2023 | at | $2,550.87 |
| 10/01/2023 | at | $2,550.87 |
| Late Charges: | | $1,557.06 |
| Corporate Advance Balance: | | $7,574.25 |
| Unapplied Balance: | | ($0.00) |

**TOTAL YOU MUST PAY TO CURE DEFAULT:**          **$489,406.90**

You can cure this default by making a payment of $489,406.90 by 11/14/2023. Please note any additional monthly payments, late charges and other charges that may be due under the Note, Security Instrument and applicable law after the date of this notice must also be paid to bring your account current. You may contact our Loss Mitigation Department at 866-825-2174 to obtain updated payment information. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current default. Please include your loan number and property address with your payment and send to:

Shellpoint Mortgage Servicing
P.O. Box 650840
Dallas, TX 75265-0840

Overnight:
Shellpoint Mortgage Servicing
75 Beattie Place
Suite LL202
Greenville, SC 29601

If you wish to dispute the delinquency, or if you dispute the calculation of amount of the delinquency and reinstatement amount, you may contact us by calling 866-825-2174.

IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, Shellpoint Mortgage Servicing offers consumer assistance programs designed to help resolve delinquencies and avoid foreclosure. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative to foreclosure. If you would like to learn more about these programs, you may contact Cherie Shelton at 8668252174, ext. 7700, Monday - Friday 8:00AM to 9:00PM and Saturday 8:00AM to 1:00PM to discuss possible options. You may also visit our website www.shellpointmtg.com. WE ARE VERY INTERESTED IN ASSISTING YOU.

You have the right to reinstate the loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense to acceleration and foreclosure. If foreclosure proceedings are undertaken, we may pursue a deficiency judgment, if permitted by applicable law. Failure to respond to this letter may result in the loss of your property.

**To the extent your obligation has been discharged or is subject to the automatic stay in a bankruptcy case, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect a debt as your personal obligation. If you are represented by an attorney, please provide us with the attorney's name, address, and telephone number.**

**Newrez LLC dba Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. Newrez LLC dba Shellpoint Mortgage Servicing's NMLS ID is 3013.**

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies by Shellpoint Mortgage Servicing.



**Attention Servicemembers and Dependents:** Servicemembers on active duty, or a spouse or dependent of such a servicemember, may be entitled to certain protections under the Servicemembers Civil Relief Act ("SCRA") regarding the servicemember's interest rate and the risk of the foreclosure. SCRA and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances. If you are currently in the military service, or have been within the last twelve (12) months, **AND** joined after signing the Note and Security Instrument not in default, please notify Shellpoint Mortgage Servicing immediately. When contacting Shellpoint Mortgage Servicing as to your military service, you must provide positive proof as to your military status. Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. Homeowner counseling is also available at agencies such as Military OneSource (www.militaryonesource.mil, 1-800-342-9647) and Armed Forces Legal Assistance (http://legalassistance.law.af.mil), and through HUD-certified housing counselors (http://apps.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact Cherie Shelton toll-free at 8668252174, ext. 7700  if you have questions about your rights under SCRA.

For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call 1-800-569-4287 or visit http://apps.hud.gov/offices/hsg/sfh/hcc/hcs.cfm. You may also contact the Homeownership Preservation Foundation's Hope hotline at 1-888-995-HOPE (4673).

This matter is very important. Please give it your immediate attention.

Sincerely,

Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC 29603
866-825-2174

**Sara D. Accardi**
Partner
saccardi@bradley.com
813.559.5500 direct



October 30, 2023

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Ryan Atkin
1500 Bay Road, Apt. 746
Miami Beach, FL 33139

<u>**NOTICE OF DEFAULT AND RIGHT TO CURE**</u>

**RE:**  **Loan Number:**  ████████
  **Property Address:**  **1500 Bay Road, Apt. 746**
  **Miami Beach, FL 33139**

Dear Mr. Atkin,

  This firm represents Shellpoint Mortgage Servicing ("**Shellpoint**"), the servicer of the above-referenced loan, on behalf of The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2007-OA4 Mortgage Pass-Through Certificates, Series 2007-OA4.  Enclosed please find a notice of default and right to cure mailed by Shellpoint to you at your mailing address on October 10, 2023 (the "**Default Notice**"). As a courtesy, we are mailing the Default Notice to you at the address of the property securing the above-reference loan and extending deadline to cure the default referenced in the Default Notice to November 30, 2023. All other terms and conditions set forth in the Default Notice remain unchanged and are incorporated herein by reference.

  Please give this matter your immediate attention.

  Sincerely,

  *Sara Accardi*

  Sara D. Accardi

Shellpoint Mortgage Servicing
P.O. Box 9103
Temecula, CA  92589-9103

2383963839

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

Send Payments to:
Shellpoint Mortgage Servicing
P.O. Box 650840
Dallas, TX  75265-0840

Send Correspondence to:
Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC  29603

20231010-354

Ryan Atkin
1500 BAY RD APT 848
MIAMI BEACH, FL 33139-3224



W_FL_DEMAND



P.O. Box 10826
Greenville, SC 29603
**Phone:** 866-825-2174
**Fax:** 866-467-1187
www.shellpointmtg.com

Sent Via First-Class Mail®

10/10/2023

Ryan Atkin
1500 BAY RD APT 848
MIAMI BEACH, FL 33139-3224

Loan Number: ███████
Property Address:   1500 Bay Road #746
                    Miami Beach, FL 33139

Dear Ryan Atkin:

This letter is formal notice by Shellpoint Mortgage Servicing, the Servicer of the above-referenced loan, on behalf of THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA4 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA4, that you are in default under the terms of the documents creating and securing your Loan described above, including the Note and Deed of Trust/Mortgage/Security Deed ("Security Instrument"), for failure to pay amounts due.

You have a right to cure your default.  To cure the default, you must pay the full amount of the default on this loan by 11/14/2023 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter).  Failure to cure the default on or before this date may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding and sale of the property.

As of the date of this notice, the total amount required to cure the default is $489,406.90, which consists of the following:

| | | | |
|---|---|---|---|
| Next Payment Due Date: | | | 10/01/2008 |
| Total Monthly Payments Due: | | | $480,275.59 |
| 10/01/2008 | at | | $2,342.91 |
| 11/01/2008 | at | | $2,342.91 |
| 12/01/2008 | at | | $2,460.64 |
| 01/01/2009 | at | | $2,460.64 |
| 02/01/2009 | at | | $2,460.64 |
| 03/01/2009 | at | | $2,460.64 |
| 04/01/2009 | at | | $2,460.64 |
| 05/01/2009 | at | | $2,460.64 |
| 06/01/2009 | at | | $2,460.64 |
| 07/01/2009 | at | | $2,460.64 |
| 08/01/2009 | at | | $2,460.64 |
| 09/01/2009 | at | | $2,460.64 |
| 10/01/2009 | at | | $2,460.64 |
| 11/01/2009 | at | | $2,460.64 |
| 12/01/2009 | at | | $2,587.20 |
| 01/01/2010 | at | | $2,587.20 |
| 02/01/2010 | at | | $2,587.20 |



W_FL_DEMAND      Rev. 12/2022
Page 1 of 6

2383963839

| | | |
|---|---|---|
| 03/01/2010 | at | $2,587.20 |
| 04/01/2010 | at | $2,587.20 |
| 05/01/2010 | at | $2,587.20 |
| 06/01/2010 | at | $2,587.20 |
| 07/01/2010 | at | $2,587.20 |
| 08/01/2010 | at | $2,587.20 |
| 09/01/2010 | at | $2,587.20 |
| 10/01/2010 | at | $2,587.20 |
| 11/01/2010 | at | $2,587.20 |
| 12/01/2010 | at | $2,649.49 |
| 01/01/2011 | at | $2,649.49 |
| 02/01/2011 | at | $2,649.49 |
| 03/01/2011 | at | $2,649.49 |
| 04/01/2011 | at | $2,649.49 |
| 05/01/2011 | at | $2,649.49 |
| 06/01/2011 | at | $2,649.49 |
| 07/01/2011 | at | $2,649.49 |
| 08/01/2011 | at | $2,649.49 |
| 09/01/2011 | at | $2,649.49 |
| 10/01/2011 | at | $2,649.49 |
| 11/01/2011 | at | $2,649.49 |
| 12/01/2011 | at | $2,615.90 |
| 01/01/2012 | at | $2,615.90 |
| 02/01/2012 | at | $2,615.90 |
| 03/01/2012 | at | $2,615.90 |
| 04/01/2012 | at | $2,615.90 |
| 05/01/2012 | at | $2,615.90 |
| 06/01/2012 | at | $2,615.90 |
| 07/01/2012 | at | $2,615.90 |
| 08/01/2012 | at | $2,615.90 |
| 09/01/2012 | at | $2,615.90 |
| 10/01/2012 | at | $2,615.90 |
| 11/01/2012 | at | $2,615.90 |
| 12/01/2012 | at | $2,615.90 |
| 01/01/2013 | at | $2,615.90 |
| 02/01/2013 | at | $2,615.90 |
| 03/01/2013 | at | $2,615.90 |
| 04/01/2013 | at | $2,615.90 |
| 05/01/2013 | at | $2,615.90 |
| 06/01/2013 | at | $2,615.90 |
| 07/01/2013 | at | $2,615.90 |
| 08/01/2013 | at | $2,615.90 |
| 09/01/2013 | at | $2,615.90 |
| 10/01/2013 | at | $2,615.90 |
| 11/01/2013 | at | $2,615.90 |
| 12/01/2013 | at | $2,615.90 |
| 01/01/2014 | at | $2,615.90 |
| 02/01/2014 | at | $2,615.90 |
| 03/01/2014 | at | $2,615.90 |
| 04/01/2014 | at | $2,615.90 |
| 05/01/2014 | at | $2,615.90 |
| 06/01/2014 | at | $2,615.90 |
| 07/01/2014 | at | $2,615.90 |

| | | |
|---|---|---|
| 08/01/2014 | at | $2,615.90 |
| 09/01/2014 | at | $2,615.90 |
| 10/01/2014 | at | $2,615.90 |
| 11/01/2014 | at | $2,615.90 |
| 12/01/2014 | at | $2,583.51 |
| 01/01/2015 | at | $2,583.51 |
| 02/01/2015 | at | $2,583.51 |
| 03/01/2015 | at | $2,583.51 |
| 04/01/2015 | at | $2,583.51 |
| 05/01/2015 | at | $2,583.51 |
| 06/01/2015 | at | $2,583.51 |
| 07/01/2015 | at | $2,583.51 |
| 08/01/2015 | at | $2,583.51 |
| 09/01/2015 | at | $2,583.51 |
| 10/01/2015 | at | $2,583.51 |
| 11/01/2015 | at | $2,583.51 |
| 12/01/2015 | at | $2,614.33 |
| 01/01/2016 | at | $2,614.33 |
| 02/01/2016 | at | $2,614.33 |
| 03/01/2016 | at | $2,614.33 |
| 04/01/2016 | at | $2,614.33 |
| 05/01/2016 | at | $2,614.33 |
| 06/01/2016 | at | $2,614.33 |
| 07/01/2016 | at | $2,614.33 |
| 08/01/2016 | at | $2,614.33 |
| 09/01/2016 | at | $2,614.33 |
| 10/01/2016 | at | $2,614.33 |
| 11/01/2016 | at | $2,614.33 |
| 12/01/2016 | at | $2,705.99 |
| 01/01/2017 | at | $2,705.99 |
| 02/01/2017 | at | $2,705.99 |
| 03/01/2017 | at | $2,705.99 |
| 04/01/2017 | at | $2,705.99 |
| 05/01/2017 | at | $2,705.99 |
| 06/01/2017 | at | $2,705.99 |
| 07/01/2017 | at | $2,705.99 |
| 08/01/2017 | at | $2,705.99 |
| 09/01/2017 | at | $2,705.99 |
| 10/01/2017 | at | $2,705.99 |
| 11/01/2017 | at | $2,705.99 |
| 12/01/2017 | at | $2,797.11 |
| 01/01/2018 | at | $2,797.11 |
| 02/01/2018 | at | $2,797.11 |
| 03/01/2018 | at | $2,797.11 |
| 04/01/2018 | at | $2,797.11 |
| 05/01/2018 | at | $2,797.11 |
| 06/01/2018 | at | $2,797.11 |
| 07/01/2018 | at | $2,797.11 |
| 08/01/2018 | at | $2,797.11 |
| 09/01/2018 | at | $2,797.11 |
| 10/01/2018 | at | $2,797.11 |
| 11/01/2018 | at | $2,797.11 |
| 12/01/2018 | at | $2,948.91 |



| | | |
|---|---|---|
| 01/01/2019 | at | $2,948.91 |
| 02/01/2019 | at | $2,948.91 |
| 03/01/2019 | at | $3,091.78 |
| 04/01/2019 | at | $3,091.78 |
| 05/01/2019 | at | $3,091.78 |
| 06/01/2019 | at | $3,091.78 |
| 07/01/2019 | at | $3,091.78 |
| 08/01/2019 | at | $3,091.78 |
| 09/01/2019 | at | $3,091.78 |
| 10/01/2019 | at | $3,091.78 |
| 11/01/2019 | at | $3,091.78 |
| 12/01/2019 | at | $3,254.96 |
| 01/01/2020 | at | $3,254.96 |
| 02/01/2020 | at | $3,254.96 |
| 03/01/2020 | at | $2,964.16 |
| 04/01/2020 | at | $2,964.16 |
| 05/01/2020 | at | $2,964.16 |
| 06/01/2020 | at | $2,964.16 |
| 07/01/2020 | at | $2,964.16 |
| 08/01/2020 | at | $2,964.16 |
| 09/01/2020 | at | $2,964.16 |
| 10/01/2020 | at | $2,964.16 |
| 11/01/2020 | at | $2,964.16 |
| 12/01/2020 | at | $2,622.80 |
| 01/01/2021 | at | $2,622.80 |
| 02/01/2021 | at | $2,622.80 |
| 03/01/2021 | at | $2,622.80 |
| 04/01/2021 | at | $2,537.44 |
| 05/01/2021 | at | $2,537.44 |
| 06/01/2021 | at | $2,537.44 |
| 07/01/2021 | at | $2,537.44 |
| 08/01/2021 | at | $2,537.44 |
| 09/01/2021 | at | $2,537.44 |
| 10/01/2021 | at | $2,537.44 |
| 11/01/2021 | at | $2,537.44 |
| 12/01/2021 | at | $2,398.95 |
| 01/01/2022 | at | $2,398.95 |
| 02/01/2022 | at | $2,398.95 |
| 03/01/2022 | at | $2,392.52 |
| 04/01/2022 | at | $2,392.52 |
| 05/01/2022 | at | $2,392.52 |
| 06/01/2022 | at | $2,392.52 |
| 07/01/2022 | at | $2,392.52 |
| 08/01/2022 | at | $2,392.52 |
| 09/01/2022 | at | $2,392.52 |
| 10/01/2022 | at | $2,392.52 |
| 11/01/2022 | at | $2,392.52 |
| 12/01/2022 | at | $2,531.95 |
| 01/01/2023 | at | $2,531.95 |
| 02/01/2023 | at | $2,531.95 |
| 03/01/2023 | at | $2,550.87 |
| 04/01/2023 | at | $2,550.87 |
| 05/01/2023 | at | $2,550.87 |

| | | |
|---|---|---|
| 06/01/2023 | at | $2,550.87 |
| 07/01/2023 | at | $2,550.87 |
| 08/01/2023 | at | $2,550.87 |
| 09/01/2023 | at | $2,550.87 |
| 10/01/2023 | at | $2,550.87 |
| Late Charges: | | $1,557.06 |
| Corporate Advance Balance: | | $7,574.25 |
| Unapplied Balance: | | ($0.00) |

**TOTAL YOU MUST PAY TO CURE DEFAULT:**                    **$489,406.90**

You can cure this default by making a payment of $489,406.90 by 11/14/2023. Please note any additional monthly payments, late charges and other charges that may be due under the Note, Security Instrument and applicable law after the date of this notice must also be paid to bring your account current. You may contact our Loss Mitigation Department at 866-825-2174 to obtain updated payment information. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current default. Please include your loan number and property address with your payment and send to:

Shellpoint Mortgage Servicing
P.O. Box 650840
Dallas, TX 75265-0840

Overnight:
Shellpoint Mortgage Servicing
75 Beattie Place
Suite LL202
Greenville, SC 29601

If you wish to dispute the delinquency, or if you dispute the calculation of amount of the delinquency and reinstatement amount, you may contact us by calling 866-825-2174.

IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, Shellpoint Mortgage Servicing offers consumer assistance programs designed to help resolve delinquencies and avoid foreclosure. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative to foreclosure. If you would like to learn more about these programs, you may contact Cherie Shelton at 8668252174, ext. 7700, Monday - Friday 8:00AM to 9:00PM and Saturday 8:00AM to 1:00PM to discuss possible options. You may also visit our website www.shellpointmtg.com. WE ARE VERY INTERESTED IN ASSISTING YOU.

You have the right to reinstate the loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense to acceleration and foreclosure. If foreclosure proceedings are undertaken, we may pursue a deficiency judgment, if permitted by applicable law. Failure to respond to this letter may result in the loss of your property.

**To the extent your obligation has been discharged or is subject to the automatic stay in a bankruptcy case, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect a debt as your personal obligation. If you are represented by an attorney, please provide us with the attorney's name, address, and telephone number.**

**Newrez LLC dba Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. Newrez LLC dba Shellpoint Mortgage Servicing's NMLS ID is 3013.**

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies by Shellpoint Mortgage Servicing.



**Attention Servicemembers and Dependents:** Servicemembers on active duty, or a spouse or dependent of such a servicemember, may be entitled to certain protections under the Servicemembers Civil Relief Act ("SCRA") regarding the servicemember's interest rate and the risk of the foreclosure.  SCRA and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances.  If you are currently in the military service, or have been within the last twelve (12) months, **AND** joined after signing the Note and Security Instrument not in default, please notify Shellpoint Mortgage Servicing immediately.  When contacting Shellpoint Mortgage Servicing as to your military service, you must provide positive proof as to your military status.  Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer.  Homeowner counseling is also available at agencies such as Military OneSource (www.militaryonesource.mil,  1-800-342-9647) and Armed Forces Legal Assistance (http://legalassistance.law.af.mil), and through HUD-certified housing counselors (http://apps.hud.gov/offices/hsg/sfh/hcc/hcs.cfm).   You can also contact Cherie Shelton toll-free at 8668252174, ext. 7700  if you have questions about your rights under SCRA.

For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes.  To obtain a list of approved counseling agencies, please call 1-800-569-4287  or  visit  http://apps.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.  You  may  also  contact  the Homeownership Preservation Foundation's Hope hotline at 1-888-995-HOPE (4673).

This matter is very important. Please give it your immediate attention.

Sincerely,

Shellpoint Mortgage Servicing
P.O. Box 10826
Greenville, SC 29603
866-825-2174

CERTIFIED MAIL®

l Service
 MAIL® RECEIPT
Only

USPS® ARTICLE NUMBER

.99 0430 0113 7021 54

|  | $ | 4.35 |
|  | $ | 0.00 |
| Delivery | $ | 2.20 |
|  | $ | 0.00 |
|  | $ | 0.63 |
|  |  | 7.18 |

**Postmark
Here**

Apt. 746
L 33139

**Reference Information**

le, July 2015



PITNEY BOWES
**$8.77** 0
US POSTAGE∞∞
FIRST-CLASS
026W00004897694
2000366972
ZIP 33602
OCT 30 2023

9314 8699 0430 0113 7021 54
RETURN RECEIPT (ELECTRONIC)

Ryan Atkin
1500 Bay Road, Apt. 746
Miami Beach, FL 33139

# EXHIBIT D

# FJUD

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE
COUNTY, FLORIDA.

GENERAL JURISDICTION DIVISION

CASE NO. 2009-87096-CA-01

THE BANK OF NEW YORK MELLON FKA THE
BANK OF NEW YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-OA4
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-OA4 PASS-THROUGH CERTIFICATES,
SERIES 2007-OA4,

This space is for recording purposes only.

Plaintiff,

VS.

RYAN ATKIN; FLAMINGO/SOUTH BEACH I CONDOMINIUM ASSOCIATION, INC.; NOY HADAR;
UNKNOWN TENANT(S); IN POSSESSION OF THE SUBJECT PROPERTY N/K/A CHRISTINA
DANTES;ANY AND ALL UNKNOWN PARTIES CLAIMING BY, THROUGH, UNDER AND AGAINST
THE NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT KNOWN TO BE DEAD OR ALIVE,
WHETHER UNKNOWN PARTIES MAY CLAIM AN INTEREST AS SPOUSES, HEIRS, DEVISEES,
GRANTEES, OR OTHER CLAIMANTS.

DEFENDANT(S).
_____/

## FINAL JUDGMENT OF FORECLOSURE

**THIS ACTION** was tried before this Honorable Court.  On the evidence presented, **IT IS
ORDERED ADJUDGED** that Judgment is GRANTED against the following defendants:

Ryan Atkin

Flamingo/South Beach I Condominium Association, Inc.

Noy Hadar

Unknown Tenant(s); in Possession of the Subject Property n/k/a Christina Dantes

Our Case #: 15-000067-FIH-Serengeti\2009-87096-CA-01\SPS                Page 1

1. **Amounts Due and Owing.** Plaintiff is due:

| Description | | Amount |
|---|---|---|
| Principal due on the note secured by the mortgage foreclosed | | $470,429.03 |
| Interest    From August 01, 2008 to June 9, 2015 | | $112,586.72 |
| Title search and Examination | | $275.00 |
| Property Tax Disbursements | | $30,573.22 |
| Year - 2014 County Tax Payment | $5,729.42 | |
| Year - 2013 County Tax Payment | $5,117.23 | |
| Year - 2012 County Tax Payment | $4,679.04 | |
| Year - 2011 County Tax Payment | $3,048.87 | |
| Year - 2010 County Tax Payment | $4,025.58 | |
| Year - 2009 County Tax Payment | $6,254.61 | |
| Year - 2008 County Tax Payment | $1,718.47 | |
| Hazard or Property Insurance Disbursements | | $5,878.13 |
| Year - 2009 Hazard/Flood Insurance | $5,878.13 | |
| Property inspection(s) | | $480.00 |
| Property Appraisal(s) | | $178.00 |
| Service of Process at  tenant inspection | | $45.00 |
| MIP/PMI Advances | | $27,630.72 |
| **SUBTOTAL** | | **$647,805.82** |

Plaintiff's Attorney's Fees:

| | |
|---|---|
| Plaintiff's Attorney's Total Non Contested Flat Rate Fee *(The requested attorney's fee is a flat rate fee that the firm's client has agreed to pay in this matter for non-contested portion of the case.  Given the amount of fee requested and the labor expended, the court finds that a lodestar analysis is not necessary for this flat fee and that a flat fee is reasonable for the non contested portion of the file.)* | **$560.00** |
| Plaintiff's Attorney's Fees based on 10 hours at $175.00 per hour and 1 hour at $200.00 per hour | **$1,950.00** |
| **Attorney's Fees Total:** | **$2,510.00** |

**GRAND TOTAL**                    **$650,585.82**

(*The requested attorney's fee is a flat rate fee that the firm's client has agreed to pay in this matter. Given the amount of the fee requested and the labor expended, the Court finds that a lodestar analysis is not necessary and that the flat fee is reasonable)

The adding machine tape is attached as Exhibit A.

2. **Interest.** The grand total amount referenced in Paragraph 1 shall bear interest from this date forward at the prevailing legal rate of interest, 4.75 percent a year.

3. **Lien on Property.** Plaintiff, whose address is c/o Select Portfolio Servicing, Inc., 3815 SW Temple, Salt Lake City, UT 84115 holds a lien for the grand total sum superior to all claims or estates of the defendant(s), on the following described property in Miami Dade County, Florida:

UNIT NO. 746S IN FLAMINGO/SOUTH BEACH I CONDOMINIUM,

ACCORDING TO THE DECLARATION OF CONDOMINIUM THEREOF,

RECORDED SEPTEMBER 15, 2006, IN OFFICIAL RECORDS BOOK 24914,

AT PAGE 3803, PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA,

AS AMENDED AND/OR SUPPLEMENTED FROM TIME TO TIME.

TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON

ELEMENTS APPURTENANT THERETO.

Property Address: 1500 Bay Rd 746S, Miami Beach, FL 33139

4. **Sale of Property.** If the grand total amount with interest at the rate described in Paragraph 3 and all costs accrued subsequent to this judgment are not paid, the Clerk of the Court shall sell the subject property at public sale on _____**JUL 2 3 2015**_____, 20___, at 9:00 A.M. to the highest bidder for cash, after first given notice as required by Section 45.031, Florida Statutes, *FIRST AVAILABLE* using the following method. The subject property shall be sold by electronic sale at www.miamidade.realforeclose.com.

5. **Costs.** Plaintiff shall advance all subsequent required costs of this action and shall be reimbursed for them by the Clerk if Plaintiff is not the purchaser of the property for sale, provided, however, that the purchaser of the property for sale shall be responsible for documentary stamps affixed to the certificate of title. If Plaintiff is the purchaser, the Clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

6. **Distribution of Proceeds.** On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of the Plaintiff's costs; second, documentary stamps affixed to the Certificate; third, Plaintiff's attorneys' fees; fourth, the total sum due to the Plaintiff, less the items paid, plus interest at the rate prescribed in Paragraph 2 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

7. **Right of Possession.** Upon the filing of the Certificate of Sale, defendant(s) and all persons claiming under or against defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property except as to claims or rights under Chapter 718 or Chapter 720, Florida Statutes, if any. Upon filing of the Certificate of Title, the person named on the Certificate of Title shall be let into possession of the property, subject to the provisions of the "Protecting Tenants at Foreclosure Act of 2009, which was extended to December 31, 2012 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

8. **Jurisdiction.** This Court retains jurisdiction of this action to enter further orders that are proper, including, without limitation, writs of possession and deficiency judgments

9. **IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT, 140 W. FLAGLER STREET, ROOM 908, MIAMI, FLORIDA, TELEPHONE 305-375-5943, WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT THE LEGAL AID SOCIETY AT THE MIAMI DADE COUNTY BAR ASSOCIATION, 123 NW FIRST AVENUE, SUITE 214, MIAMI, FLORIDA, (305) 579-5733, TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT

**THE MIAMI DADE COUNTY BAR ASSOCIATION LEGAL AID SOCIETY, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER THE RECEIPT OF THIS NOTICE.**

**10. The Final Judgment is ENTERED.**

DONE AND ORDERED in Chambers, Dade County Courthouse, Miami, Florida, this _____ day of _____, 20__.

_____
Circuit Court

JUN - 9 2015

ARTHUR L. ROTHERNBERG
SENIOR JUDGE

Copies furnished to all parties:

Gladstone Law Group, P.A.
1499 W. Palmetto Park Road, Suite 300
Boca Raton, FL 33486
eservice@gladstonelawgroup.com

Ryan Atkin
601 NE 36th Street, #2609
Miami, FL 33137

Bridgette Elizabeth Bonet, Esq.
Association Law Group P L
1200 Brickell Ave Ste 2000
Miami, FL 33131
bbonet@algpl.com

Noy Hadar
1500 Bay Rd #746S
Miami Beach, FL 33139

Unknown Tenant(s); in Possession of the Subject Property n/k/a Christina Dantes
1500 Bay Rd 746S
Miami Beach, FL 33139

FINAL ORDERS AS TO ALL PARTIES
SPS DISPOSITION
NUMBER _____ 3
THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES.
Judge's Initials

# EXHIBIT A

```
      470,429•03  +
      112,586•72  +
          275•    +
       30,573•22  +
        5,878•13  +
          480•    +
          178•    +
           45•    +
       27,630•72  +
009 ° ° ° ° • • • • • • • • •
      648,075•82  *+

      648,075•82  +
        2,510•    +
002 ° ° ° ° ° ° ° ° ° • •
      650,585•82  *+


      470,429•03  +
      112,586•72  +
          275•    +
       30,573•22  +
        5,878•13  +
          480•    +
          178•    +
           45•    +
       27,630•72  +
009 ° ° ° ° ° ° ° ° ° • •
      648,075•82  *+

          560•    +
        1,950•    +
002 ° ° ° ° ° ° ° ° ° • •
        2,510•    *+

        2,510•    +
      648,075•82  +
002 ° ° ° ° ° ° ° ° ° • •
      650,585•82  *+
```

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT, IN AND FOR DADE
COUNTY, FLORIDA

CASE No. 2009-87096-CA-01

THE BANK OF NEW YORK MELLON FKA THE
BANK OF NEW YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-OA4
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-OA4 PASS-THROUGH CERTIFICATES,
SERIES 2007-OA4,



                              PLAINTIFF,

VS.

RYAN ATKIN, ET AL.,

                      DEFENDANT(S).
_____/

~~SUPPLEMENTAL~~ ORDER ON PLAINTIFF'S MOTION TO VACATE FINAL JUDGMENT ~~AND~~
*Vacate* ~~CANCEL FORECLOSURE SALE SET FOR JULY 23, 2015~~

        This cause having come before the Court on Plaintiff's Motion to Vacate Final Judgment and Cancel
Foreclosure Sale set for July 23, 2015, and the Court having reviewed the pleadings and case file, and being
otherwise fully advised in the premises, it is

**ORDERED AND ADJUDGED** that the Motion is hereby:

        ✓ GRANTED. Final Judgment entered on July 9, 2015 is hereby vacated. ~~The foreclosure sale
scheduled for July 23, 2015 at 09:00 AM is hereby canceled.~~

        ____ DENIED.

        **DONE AND ORDERED** in open Court, Dade County Courthouse, Miami, Florida, this **DEC 0 9 2015**
day of _____, 2015.

                                    _____
                                    CIRCUIT JUDGE

*Copies furnished to all parties on the attached Service List*
                                        JORGE E. **CUETO**
                                        CIRCUIT COURT **JUDGE**

Our Case #: 15-000067-FIH-Serengeti\2009-87096-CA-01\SPS

NONA BROWN

6/12/15 — 6/17/15 — 6/22/15 /

## REQUEST FOR ORIGINAL NOTE

Scanned
06/9/15

Current Case No ___09-87096-CA___

The Original Note was previously Filed in:_____

___ Prior Case No_____

✓Current File: ___09-87096-CA___

✓Date of previous filing: ___6/9/15___

FILED FOR RECORD
2018 MAY 24   AM 9: 54
CLERK, CIRCUIT & COUNTY COURTS
DADE COUNTY, FLA.
CIVIL #94

The Note is requested:

✓To be in Court at ___5/24/18___ (Location)on ___10:00 am___ (date set/time)

___To be released to Plaintiff Firm.

Requesting Law Firm: ___Liebler Gonzalez Portuondo___

Requesting Attorney: ___Peter Hernandez___ Bar No ___64309___

Contact Info: Email Address: ___pah@lgplaw.com___

Telephone No ___305-379-0400 / 786-246-4494___

---

ORIGINAL DOCUMENTS RELEASED FOR COURT DATE ON ___5/24/18___
✓ NOTE *Cancelled* ___MORTGAGE ___ ASSIGNMENT OF MORTGAGE
___ LOAN MODIFICATION AGREEMENT ___ OTHER

PICKED UP BY: NAME ___Pete Hernandez___ BAR # ___64309___

SIGNATURE: _____ DATE: ___5/24/18___

---

*Ana Alvarado 179373*

This form may be hand-delivered to the Court Clerk, or Clerk Supervisor

Dorian Mathis in the Clerk's office (305)349-7413

Case 1:23-cv-24598-KMM   Document 1-9   Entered on FLSD Docket 12/05/2023   Page 65 of 66

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA
CIVIL DIVISION**

BANK OF NEW YORK MELLON, AS     **GENERAL JURISDICTION DIVISION**
TRUSTEE

       **Plaintiff,**                  **CASE NO.: 2009-087096-CA**

vs.

RYAN ATKIN, et al.,

       **Defendant(s).**

_____

### BANK OF NEW YORK MELLON'S NOTICE OF DISMISSAL

Pursuant to Fla. R. Civ. P. 1.420(a), Plaintiff Bank of New York Mellon, f/k/a The Bank of New York, as Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2007-OA4 Mortgage Pass-Through Certificates, Series 2007-OA4, through counsel, hereby provides notice of dismissal without prejudice of its claims against all Defendants in this action.

                     */s/ D. Brian O'Dell*
                     D. Brian O'Dell (FBN: 659665)
                     Lauren G. Raines (FBN: 11896)
                     BRADLEY ARANT BOULT CUMMINGS LLP
                     1819 Fifth Avenue North
                     Birmingham, AL 35203-2104
                     Telephone: (205) 521-8000
                     Facsimile: (205) 521-8800
                     bodell@bradley.com
                     lraines@bradley.com

                     ATTORNEYS FOR PLAINTIFF

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on May 31, 2019, I served the foregoing by filing electronically with the Clerk of the Court using the Florida e-portal system which will send notification of such filing to the following counsel of record or by other means as indicated below:

Miguel M. Cordano, Esq.
Dora F. Kaufman, Esq.
Liebler Gonzalez & Portuondo
Courthouse Tower – 25th Floor
44 West Flagler Street
Miami, Florida 33130
mc@lgplaw.com
dfk@lgplaw.com

Bruce Jacobs, Esq.
Alfred I. DuPont Building
169 East Flagler Street, Suite 1640
Miami, Florida 33131
efile@bjalegal.com, jacobs@bjalegal.com

Bridgette Elizabeth Bonet, Esq.
Association Law Group PL
1200 Brickell Avenue, Suite 2000
Miami, Florida 33131
bbonet@algpl.com

Laura Carbo, Esq.
Tromberg Law Group, PA
1515 South Federal Highway, Suite 100
Boca Raton, Florida 33432
eservice@tromberglawgroup.com

Noy Hadar
1500 Bay Road #746S
Miami Beach, Florida 33139
*(via U.S. Mail)*

Unknown Tenant(s) in Possession of the Subject Property n/k/a Christine Dantes
1500 Bay Road #746S
Miami Beach, Florida 33139
*(via U.S. Mail)*

*/s/ D. Brian O'Dell*
ONE OF THE ATTORNEYS FOR PLAINTIFF

2